WHEELING & L. E. RY. CO. v. PITTS-
BURGH & W. V. RY. CO.

Circuit Court of Appeals, Sixth Circuit.
June 21, 1929.

No. 5445.

Clan Crawford and W. H. Boyd, both of
Cleveland, Ohio (Squire, Sanders & Demp-
sey, of Cleveland, Ohio, on the brief), for
appellant.

H. H. Hoppe, of Cleveland, Ohio (C. F.
Taplin and Taplin & Fillius, all of Cleveland,
Ohio, on the brief), for appellee.

Before DENISON, MOORMAN, and
HICKENLOOPER, Circuit Judges.

MOORMAN, Circuit Judge. This is an
appeal from a preliminary injunction grant-
ed on the motion of Pittsburgh & West Vir-
ginia Railway Company, a stockholder of the
Wheeling & Lake Erie Railway Company,
and enjoining the latter company and its di-
rectors from authorizing or permitting the
company or its officers to abandon its On-
tario Street passenger station in Cleve-
land, or from entering into any contract with
the Cleveland Union Terminals Company,
whereby that company would have the right
to enter upon the Wheeling Company's On-
tario Street station site for the purpose of
making excavations thereon or constructing
thereon subways, retaining walls, piers or
foundations, until a certificate of public con-
venience or necessity therefor should be is-
sued by the Interstate Commerce Commis-
sion. The injunction was conditioned upon
the execution by the plaintiff of a bond in
favor of the defendants enjoined, to be ap-
proved by the court. The bond has been exe-
cuted and is ample to protect the defendants
so enjoined, but affords no protection to the
Terminals Company if the injunction was
wrongfully issued.

The Cleveland Union Terminals Company was organized under authority of the Interstate Commerce Commission by the New York Central Railroad Company, the Cleveland, Cincinnati, Chicago & St. Louis Railroad Company, a subsidiary of New York Central and known as the "Big Four," and the New York, Chicago & St. Louis Railroad Company, known as the "Nickel Plate." These three companies own the entire capital stock of the Terminals Company. That company was organized for the purpose of constructing a union station with terminal facilities adjacent to the public square in Cleveland. It procured from the Interstate Commerce Commission a certificate of public convenience and necessity for the construction of such station and terminals according to plans which it filed with the Commission, and which included within the territory of the terminals the Ontario Street passenger station of the Wheeling Company. Under stipulations which were entered into with the Wheeling Company, that company, which at first had opposed the issuance of the certificate, withdrew its opposition thereto upon condition that the issuance thereof should not prejudice its rights under the laws of Ohio in and to its Ontario Street station. Thereafter the New York Central and the Nickel Pate, in conjunction with the Baltimore & Ohio Railroad Company, without the consent of the Commission, purchased a controlling interest in the Wheeling Company, and later, in December of 1928, the Terminals Company entered into a contract with the Wheeling Company under which it was agreed that the Wheeling Company would convey to the Terminals Company its Ontario Street station and would use the union station to be constructed by the Terminals Company, which company agreed to furnish passenger facilities for the Wheeling Company and to handle its trains into and out of the station. Applications for permission to do the things necessary to carry out this contract are now pending before the Commission.

In anticipation of the approval of this contract by the Commission, the Terminals Company began the construction of its depot and yards, and the work progressed so far that it was economically wise for it to do certain work without delay upon the Ontario Street station site. In order to do this it negotiated an agreement in January of 1929 with the Wheeling Company, the signing and carrying out of which are enjoined by the order complained of. The grounds for the injunction, as set out in the plaintiffs' bill, were that the making of the agreement would be an abandonment by the Wheeling Company of its station site in violation of the Transportation Act (section 1, par. 18, title 49, U. S. Code [49 USCA § 1, par. 18]); that it would be illegal because it had not been approved by the Public Utilities Commission of Ohio, as required by sections 504—2 and 504—3 of the General Code of Ohio; that it would be illegal for the further reason that the consent of the stockholders of the contracting parties had not been obtained thereto as required by sections 8806–8809 of the General Code of Ohio; and that it would be contrary to section 7 of the Clayton Act (section 18, tit. 15, U. S. C. [15 USCA § 18]) in that it was determined upon subsequent to the acquisition of the stock of the Wheeling Company by Baltimore & Ohio, New York Central, and Nickel Plate, which acquisition had been declared by the Interstate Commerce Commission to be unlawful, the Commission having ordered (Interstate Commerce Commission v. Baltimore & O. R. Co., 152 I. C. C. 721), the three companies mentioned to divest themselves of the stock.

It was assumed in argument that the order of injunction applied only to the proposed agreement of 1929, and it is within that limitation that we consider it. It is admitted that this agreement has neither been submitted to nor approved by the Interstate Commerce Commission. The court below issued the injunction upon the ground that the making of it by the Wheeling Company would be an abandonment of its property covered thereby within the meaning of the Transportation Act. That act provides (section 1, par. 18, tit. 49, U. S. C. [49 USCA § 1, par. 18]), that no carrier by railroad subject to the provisions of the act "shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment." Paragraph 20 of the same section of the act provides that any abandonment contrary to paragraph 18 "may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the state or states affected, or any party in interest."

It may well be doubted whether the Pittsburgh Company is a "party in interest," within the meaning of this latter section, or, if so, whether upon motion of such a party, as distinguished from the United States or

the other regulatory agencies therein mentioned, the provision as to the injunction is mandatory, or is merely a grant of power, to be exercised according to general equity principles. It is argued, too, that the contract, now pending before the Commission for approval, does not disclose such an "abandonment" as requires that approval, although, to remove uncertainty, the application has been made. We pass these questions and proceed to consider whether the proposed agreement, with the work that the Terminals Company is permitted to perform thereunder, is an abandonment within the meaning of the statute in question.

The agreement provides that it shall run only until February 1, 1930. It states that the Wheeling Company is willing to permit "the temporary use of said lands for the construction of said facilities" during that time upon certain conditions and for certain considerations, and it grants to the Terminals Company the right to enter upon and use such portions of the land for excavation and construction work "as will not unreasonably interfere with the Railway Company's use of said property, subject, however, to the approval from time to time of the general manager of the Railway Company." The Terminals Company agrees to pay the Wheeling Company a rental of $5,145 a month from and after the execution of the agreement until it terminates, February 1, 1930; and it is provided that, if at that time the parties for any reason are unable to agree on terms for the further use or occupancy of the property by the Terminals Company, the rights of that company shall cease, and all structures put upon it by the Terminals Company shall belong to the Railway Company free from any claim of the Terminals Company. The Terminals Company further agrees in such event to restore the premises to their former condition, and it is to execute a bond to the Railway Company in the sum of $1,000,000 to secure the performance of these covenants.

Both parties, in planning to enter into this agreement, anticipated that the Interstate Commerce Commission would approve the agreement of December 1928. Both recognized, though, that such approval might not be obtained, and hence they provided for the restoration of the property by the Terminals Company and the relinquishment of any right or claim thereto by it under the agreement in question. This agreement provides in terms, as we have said, that the use by the Terminals Company shall not "unreasonably interfere with the Railway Company's use of said property," or cause any "interference with the ownership, possession, proper and safe operation and use or occupancy" of it by the Wheeling Company. Before it was negotiated, the Wheeling Company had discontinued using the Ontario Street station under an order of the Commission directing it to do so, because of the unsafe condition of the station. The same order authorized it to use the station of the Erie Railroad at Superior avenue, and the Terminals Company procured for it the right to operate its trains over the tracks of the Big Four and Erie Railroad into that station. The expense of this service until the new terminals are completed is to be borne by the Terminals Company.

The Supreme Court of Ohio, in Pittsburgh & W. Va. R. R. Co. v. Public Utilities Commission of Ohio, 166 N. E. 372, not yet officially reported, has held that the contract now before the Commission is not an abandonment of the facilities of the Wheeling Company under the Ohio statutes. The court thought that what was proposed to be done under that contract was merely a substitution or improvement of service and that it should be treated as if the Wheeling Company were constructing a new passenger station or substituting a new one for the old. We are not called on to pass upon this first contract, but our views of the effect of the contract here involved in respect to the federal statute coincide with those of the Ohio court as to the first contract in respect to the state statute.

Abandonment does not mean a partial disuse with an intention to complete it upon a contingency. It means a final relinquishment or giving up without intention of resuming. That is not what this contract does. It is the purpose of the Wheeling Company, it is true, if the contract of December, 1928, is approved by the Commission, to give up the property for individual station facilities; but the mere granting of permission to the Terminals Company as is here contemplated, to do certain work that will facilitate the building of the station in the event that the contract is approved by the Commission and upon the condition that if it is not approved there will be a restoration of the property, and with the reservation that the work to be done shall not unreasonably interfere with the use of the property by the railroad company, is not, in our opinion, an abandonment within the meaning of the statute. The fact that the property is not and cannot be used for a passenger station at the present time does not affect the question. That condition existed and was recognized by the Commis-

sion before the agreement here involved was negotiated; and even therefore if the Terminals Company were not engaged in working on these premises the Wheeling Company could not use them for passenger purposes. We find nothing in the record to indicate that the directors of the company permitted the station to fall into disrepair for the purpose of procuring such an order from the Commission.

The same reasons that impel the foregoing holding lead to a like conclusion as to the inapplicability of sections 504—2 and 504—3 of the General Code of Ohio,—indeed, the decision of the Supreme Court of Ohio, in Pittsburgh & W. Va. Ry. Co. v. Public Utilities Commission of Ohio, supra, is conclusive of that question. Neither are sections 8806–8809, inclusive, of the General Code of Ohio applicable. It is doubtful that those provisions apply to a terminal company at all, but if they do they do not apply to such a contract as is here involved. Whether they apply to the earlier agreement is a question with which we are not concerned. If they do, the most that can be claimed is that that agreement cannot be made effective until the companies have secured the approval thereto of their stockholders as required by these statutes. There will be ample time for that, if and after the Commission determines that the contract may be made.

■ Nor is there any basis for the injunction in the Clayton Act. All the matters complained of under that act are subject to the regulation and supervision of the Interstate Commerce Commission, and by the express terms of the act no one, except the United States, is authorized to bring a suit in equity thereunder for injunctive relief, in respect of any matter subject to the regulation and supervision of the Commission. Section 26, tit. 15, U. S. C. (15 USCA § 26). If, however, such relief were open to a minority stockholder, it would be subject to the ordinary rules of equity, and an injunction would not be granted, except upon a balancing of relative convenience and injury. Upon that hypothesis it cannot be seriously contended that the injunction was warranted. The rec-

ord shows that the work of the Terminals Company has reached such a stage at this time that it will be seriously delayed, unless it can be carried on according to a plan which requires certain work to be done upon the premises in question, and also that the holding up of this work will result in a daily loss to that company of several thousands of dollars. On the other hand, the complainant is in no danger of suffering any injury or damage from the doing of the work. If the Commission should not give its approval to the contract of December, 1928, the property of the Wheeling Company will be restored to the condition that it was in when the work was begun. In the meantime that company is receiving more than $5,000 a month rent while the work is in progress. This, in view of other provisions of the contract, seems to be an entirely adequate rental. If the contract should be approved by the Commission, there will be an administrative determination by an expert body, entitled to the greatest weight, that the arrangement is just and reasonable. If it should not be approved as drawn, the Commission has the power either to reject it entirely or to approve it upon terms that the Commission deems fair to all parties interested, including the stockholders. The plaintiff has the right to present its views of these matters to the Commission, and, if it is dissatisfied with the decision of that tribunal, it may go further and present them to the courts. Cleveland, C., C. & St. L. R. Co. v. Jackson, 22 F.(2d) 509 (6 C. C. A.).

■ We recognize that, when the issue of a preliminary injunction rests upon the discretion of the trial judge, his exercise thereof will not usually be reviewed; but this familiar rule has no application where it is fairly apparent, as it is here, that he was chiefly moved by a view of the law with which the appellate court is unable to agree. Whether this agreement shows an abandonment within the meaning of the statute is a legal question. Louisville & N. R. Co. v. Western Union Tel. Co. (C. C. A. 6) 207 F. 1, 4, 5.

The order of injunction is accordingly vacated.