**CITY OF ALEXANDRIA, LOUISIANA,**
Appellant,

v.

**CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY,**
Appellees.

No. 19675.

United States Court of Appeals
Fifth Circuit.

Nov. 30, 1962.

8

Frank H. Peterman, George B. Hall, Alexandria, La., for appellant.

Nauman S. Scott, Provosty, McSween, Sadler & Scott, Alexandria, La., Wright, Lindsey, Jennings, Lester & Shults, Little Rock, Ark., for plaintiff-appellees.

Before HUTCHESON, WISDOM and GEWIN, Circuit Judges.

WISDOM, Circuit Judge.

█ The unusual posture of the parties to this appeal relates to the enforcement of a city's paving lien when the property subject to the lien includes a portion of a railroad roadbed. The validity of the lien is not at issue. The question for decision is whether the city's enforcement of its lien by execution proceedings through seizure and sale of the property is tantamount to the railroad's "abandonment" of the line within the meaning of the Interstate Commerce Act, 49 U.S.C.A. § 1(18), prohibiting abandonments of line without the authority of the Interstate Commerce Commission.

█ The facts are not disputed. The Chicago, Rock Island & Pacific Railroad Company is an interstate common carrier. Its main line in Louisiana extends through the City of Alexandria. In 1958 the City levied a $38,530.85 paving assessment against Rock Island, one of 133 property owners abutting a newly paved avenue. For various reasons, Rock Island refused to pay the assessment.[1] The City sued the railroad company and obtained a judgment for the amount of the assessment; the Louisiana Supreme Court upheld the validity of the assessment and

1. In the state courts Rock Island contended that its property did not abut the street; that the assessment was so arbitrary and confiscatory as to render the assessment unconstitutional; that Rock Island was relieved of liability for paving by virtue of an agreement it had with the Police Jury of Rapides Parish.

the lien. City of Alexandria v. Chicago, Rock Island & Pacific R. R., 1961, 240 La. 1025, 126 So.2d 351. After the judgment became final the City, following the usual Louisiana procedure, obtained a writ of *fiere facias* to the Sheriff of Rapides Parish; the Sheriff seized the two tracts of railroad property subject to the paving lien and gave notice that the property would be sold at public auction.[2] Rock Island admits that the lien covered the entire tracts, including the roadbed. June 23, 1961, Rock Island obtained a temporary restraining order from the United States District Court. Subsequently, after a hearing largely devoted to showing the interstate character of Rock Island's operations, the District Court held that "the sale of property upon which these tracks run would in effect constitute an abandonment". The court permanently enjoined the City of Alexandria from selling a twenty-foot strip of land, described as the right-of-way on which the railroad tracks are located, without first obtaining permission from the Interstate Commerce Commission for an *"abandonment"* of that part of the Rock Island's line. The court left the City free to sell the railroad company's other land, extending about sixty-five feet to the west and forty feet to the east of the twenty-foot strip. The City appeals from this order.

Subsection 18 of Section 1 of the Interstate Commerce Act (49 U.S.C.A. § 1 (18)) provides that

> " * * * no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

Subsection 20 (49 U.S.C.A. § 1(20)) provides that "any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the State or States affected, or any party in interest * * *." These provisions of the Act vest the Interstate Commerce Commission with jurisdiction over abandonments and impose on carriers the duty of obtaining a certificate of convenience and necessity whenever there is an abandonment. Smith v. Hoboken Railroad, Warehouse & Steamship Connecting Co., 1946, 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123; Thompson v. Texas Mexican R. R., 1946, 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132. This jurisdiction attaches whenever there is present "any question, necessary to a judicial disposition, relating to change in railroad line or operation, on which there is room for colorable doubt or controversy as to whether public convenience and necessity is involved or is affected, and in which it therefore may be possible for an abandonment to be present in a transportational sense, even though not by general legal criterion." City of Des Moines v. Chicago & North Western R. R., 8 Cir., 1959, 264 F.2d 454, 458. Since, argues Rock Island, the sale of its roadbed would constitute the abandonment of a portion of its line, this cannot be accomplished without a certificate from the Interstate Commerce Commission, for there is at least a "colorable doubt" as to its effect on public convenience and necessity.

The Interstate Commerce Commission requires an intention to abandon. Thus, the Commission has defined "abandonment" as used in Section 1(18) as re-

---

2. Witnesses testified that the property subject to the paving lien was worth $78,500, exclusive of the twenty-foot strip on which the tracks are located. However, Rock Island, in its defense to the suit in the state court, alleged that the amount of the lien exceeded the value of the property. Rock Island admits that the lien covers all of its property abutting Broadway Avenue, the paving of which gave rise to this litigation.

quiring "cessation of service * * * or long disuse of the line, coupled with the intention not to resume such service or use." Akron & Barberton Belt R. R. Abandonment of Operation, 239 I.C.C. 250, 254. In Williams v. Atlantic Coast Line R. Co., 4 Cir., 1927, 17 F.2d 17, 22, the Court said: "Abandonment involves more than mere non-user. There must be an intention on the part of the company to abandon." See also Wheeling & Lake Erie Ry. Co. v. Pittsburgh & West Virginia Ry. Co., 6 Cir., 33 F.2d 390, 392; City of Flint v. Grand Trunk Western R. R. Co., 6 Cir., 69 F.2d 604, 606; Myers v. Arkansas & Ozarks Ry. Corp., 1960, D.C., 185 F.Supp. 36, 41.

■ Not every change in ownership or mode of operation constitutes an abandonment. No Commission approval is necessary where the cessation of operations results not from the volition of the railroad but as a result of conditions over which the railroad has no control. Zirn v. Hanover Bank, 2 Cir., 1954, 215 F.2d 63. See Myers v. Arkansas and Ozarks Ry. Corp., 1960, D.C., 185 F.Supp. 36.

The short answer to Rock Island's contention is that the record shows no evidence whatever of any intention to abandon or that there will be any abandonment. There has been no interruption or discontinuance of services in the operation of the railroad in Alexandria, and the City has no intention to interfere with the operation of the company's line. The attorneys for Rock Island assert that Rock Island intends *not* to abandon operations or to abandon any portion of its line in Alexandria. This is an extraordinary situation, one that causes the Court to wonder what all the shouting is about. If Rock Island intends not to abandon any portion of its line or any operation in Alexandria, there is an obvious solution: Rock Island should pay the judg-

ment against it. If Rock Island intends to refrain from doing what comes naturally, that is, paying the assessment in order to avoid any interruption of operations, then it might be said that the sale constituted an abandonment—but that would be Rock Island's deliberate decision. In such case, Rock Island is under a duty to apply to the Interstate Commerce Commission for a certificate permitting abandonment of part of its line. The duty is on the carrier to initiate such action; there is no reason to impose responsibility for initiating action on a lien-holder or judgment creditor who should be able to assume that a railroad company will honor its legal obligations and not force a sale at public auction. And, even if there should be a forced sale, there is nothing to prevent Rock Island from buying in the property. Finally, even a transfer of title to a third person is not necessarily inconsistent with the railroad's continued operation of the line; operations could continue without interruption, as a result of the railroad's negotiations with the purchaser or the railroad's exercising its right of eminent domain under Louisiana law.

The Commission's ruling in Application of Illinois Terminal Railroad Co., I.C.C. Finance Docket No. 20388 (1958), lends scant support to Rock Island's contention. There, the railroad applied for permission to sell a bridge and its elevated rail approaches to the City of Venice, Illinois; Venice would, concurrently with the sale, lease back to the railroad the exclusive right to use the bridge for railroad operations. The Commission held that the proposed transactions constituted "an abandonment and an acquisition of a portion of a line of railroad" under Section 1(18).[3] The crucial language is:

"If a railroad in such manner and without our approval may dispose of

3. If the Commission's opinion is construed as holding that any change in title constitutes abandonment requiring Commission approval under Section 1(18), such a holding is not supported by court decisions. See, e. g., Zirn v. Hanover Bank, 2 Cir., 1954, 215 F.2d 63. An abandon-

ment means "any discontinuance of operations by the party presently operating," In re Boston Terminal Co., D.C.Mass. 1947, 71 F.Supp. 472, and seems to require an intent to abandon. However, the abandonment of a line by one carrier with an acquisition of trackage rights over the

its interest in all or a part of its line, and in substitution thereof *acquire a sharply limited leasehold or similar interest under terms over which we may exercise no control,* it could thereby disable itself from fulfilling its common carrier obligations. Thus, the purpose and intent of section 1(18), which we are required to administer and enforce with a view to carrying out the expressed national transportation policy of the Congress, would be defeated." (Emphasis added)

In that case, by its application to the Commission, Illinois Central made clear its intention to sell part of its line and to acquire a line (by lease-back) under terms over which the Commission had no control. Here, on the other hand, there is nothing in the record to show that Rock Island intends to permit the property to be sold to others or to permit any interruption in its operations in Alexandria.

The validity of special assessment liens against railroad property was upheld by the Supreme Court in Mackey v. Choctaw, O. & G. R.R., 1921, 256 U.S. 531, 41 S.Ct. 582, 65 L.Ed. 1076. That case dealt with a railroad right-of-way over Indian lands. The railroad company contended that enforcement of the assessments by sale would sever an integral part of the railway and would prevent the defendant from performing its duty as a carrier. The Court of Appeals said:

> "*But if it is their [the railroads'] duty to pay, and to save the property from tax sale and dismemberment, they cannot well plead their own default.* It is settled that a railroad right of way is subject to general taxation, even one granted by Congress over an Indian reservation * * *. The general rule, sustained by the weight of authority, is that a railroad right of way whether owned in fee or held in easement, is real estate, property, or ground

which may be subjected to assessment for the cost of local improvements." (Emphasis added.) 10 Cir., 261 F. 342, 344.

The Supreme Court affirmed the judgment: "If the validity of the assessment is established, it may be assumed that due payment will follow." The Court held that the mere fact that the property was useful to the United States did not relieve the railroad company from being taxed for street paving. The Court said:

> "Street paving is a class of betterment to which the railroad right of way and station property [are] generally held to be subject. * * * (Citing authorities.) *It is urged that, if the assessment is left unpaid, a sale to enforce the lien would sever an integral part of the railway. The same objection might be urged against the validity of a lien for general taxes locally assessed upon railroad property or a mechanic's lien upon the same.* The objection is clearly unsound." (Emphasis added.) 256 U.S. 531, 539, 41 S.Ct. 582, 584.

The facts giving rise to the Choctaw decision occurred before enactment of the Transportation Act of 1920 (the Interstate Commerce Act) prohibiting abandonments of line without authority of the Interstate Commerce Commission. Moreover, the Supreme Court pointed out that it had "no occasion to deal now with the method [or] means to be pursued in enforcing" the assessment. However, Rock Island makes the same argument against enforcement that Choctaw made against assessment. We react as the courts did in the Choctaw case: It is up to the railroad to prevent any interruption of operations or severance of a segment of line by prompt payment of valid assessments.

If the railroad's position were accepted, all taxing bodies—municipal, state and federal—would be seriously ham-

---

parallel lines of another carrier—the situation to which the Commission in Application of Illinois Terminal Railroad Company analogized the sale and lease

back—does fall within the accepted definition of an abandonment as an actual cessation of operations over a line of track.

pered in their efforts to collect taxes levied against railroad property. The real estate, physical plant, and rolling stock of a railroad would be completely exempt from levy of execution—unless the State or the Federal Government first initiated proceedings for a certificate of convenience and necessity from the Interstate Commerce Commission and then, after a hearing, convinced the Commission that a sale of the property would be in the public interest.

Rock Island presents a new twist in the pseudo-legal doctrine of interposition: it seeks to interpose the Interstate Commerce Commission between railroads and any federal, state, or municipal body attempting to collect an unpaid tax by executing a lien levied on railroad property—even when the railroad concedes the validity of the tax and the lien, and when payment will avoid a forced sale. There is nothing in the language of subsection 18 of the Interstate Commerce Act and nothing in the legislative history of the Act to lead us to believe that Congress intended any such exaltation of the Commission in this federal system of ours.

The judgment is reversed and remanded with instructions to dissolve the injunction.