William J. BROWN et al., Plaintiffs,

v.

CONSOLIDATED RAIL CORPORATION, Defendant.

No. C76–405.

United States District Court, N. D. Ohio, E. D.

Aug. 18, 1976.

**1254**

Norton N. Newborn, Metzenbaum, Gaines & Stern Co. LPA., John R. Climaco, Sp. Counsel to Atty. Gen., Cleveland, Ohio, Donald J. Guittar, Ass't Atty. Gen., Columbus, Ohio, for plaintiffs.

Laurence Z. Sheikman, Philadelphia, Pa., Frederick G. Hoffmann, Wallace R. Steffen, Cleveland, Ohio, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAMBROS, District Judge.

Plaintiffs have brought this action against the Consolidated Rail Corporation (Conrail) seeking declaratory relief, injunctive relief, and damages for Conrail's alleged improper termination of rail service at the former Erie Lackawanna Ore Dock located on the Cuyahoga River.

By its prior order of May 4, 1976 the Court granted the plaintiffs' motion for a temporary restraining order enjoining Conrail from discontinuing service at the Erie Dock. However, the Court stayed execution of its order pending a determination by the Special Court, 45 U.S.C. § 719, of the proper forum for this lawsuit. The plaintiffs did file for such a determination with the Special Court, but the need for such determination was obviated by the parties' subsequent stipulation that jurisdiction was properly vested in this District Court.

The parties returned to this Court for a determination of the bond to be posted on the Court's temporary restraining order. In lieu of such determination the parties agreed to try the case on the merits, bifurcating such trial as to the issues of liability and damages. On July 2, 1976 the liability issue was tried to the Court.

### I. Background

In order to provide an integrated, self-sustaining rail service system in the midwest and northeast region of the United States, Congress enacted the Regional Rail Reorganization Act of 1973 (RRRA). 45 U.S.C. § 701 et seq. This rail service system was to be established by the amalgamation of the rail properties of eight railroads in reorganization [1] into one railroad. The United States Railway Association (USRA) and Conrail were established as the implementing and operational organizations of the RRRA.[2]

Pursuant to 45 U.S.C. §§ 711–725 the USRA established a Final System Plan (FSP) by which all rail properties owned, based, operated or controlled by the railroads in reorganization were to be conveyed to Conrail. The FSP was published by the USRA on July 25, 1976.

### II. Facts

On April 1, 1976 pursuant to the FSP promulgated by the USRA and the conveyance process set forth in 45 U.S.C. § 743(b) Conrail acquired a large tract of real estate in Cleveland, Ohio. This large parcel consists of two adjacent pieces of property separated by the Cuyahoga River. The northern portion of the property, which borders on Lake Erie, was formerly owned by Penn Central Transportation Company; the southern riverbed portion of the property

---

1. "Railroad in Reorganization" means a railroad which is subject to bankruptcy proceedings and which has not been determined by a court to be reorganizable or not subject to reorganization pursuant to the RRRA. 45 U.S.C. § 702(12).

2. Conrail is subject not only to the RRRA, but also to the Interstate Commerce Act (ICA). 49 U.S.C. § 1 et seq. These respective acts have recently been amended by the Railroad Revitalization and Regulatory Reform Act of 1976 (RRRRA). P.L. 94–210 (Feb. 5, 1976). The Court's references are to the RRRA or the ICA as amended by the RRRRA.

was formerly owned by the Erie Lackawanna Railway Company. Situated on this consolidated tract of land are parts of main line tracks, yard tracks, switches, spur tracks, private sidings and huletts. There are four huletts on the lakefront property, the C & P Dock, and three huletts on the riverbed property, the Erie Dock. These dock facilities are used to unload ore freighters.

The C & P Dock is operated by the Ohio & West Pennsylvania Dock Company, a subsidiary of the Hanna Mining Company. The actual operations of the C & P Dock are conducted by members of Local 1956, International Longshoreman's Association, pursuant to a collective bargaining agreement with the Ohio & West Pennsylvania Dock Company. In accordance with the terms of this agreement the C & P Dock operates on a six-day workweek, with no regular work being done on Sundays. As recently as April, 1976 Local 1956 refused the Company's request to work Sundays.

During the shipping season, which begins in early April for docks on the Great Lakes, the C & P Dock receives between four to twelve ships for unloading per week. The facilities at the C & P Dock accommodate self-unloading ships as well as ships which must be unloaded by hulett.

At all times relevant to this lawsuit the Erie Dock was operated by the Erie Dock Company, a subsidiary of the Pickands-Mather Company.[3] The operations of the Erie Dock are conducted by members of Local 13819 of the United Steelworkers of America (USW) pursuant to a collective bargaining agreement with the Erie Dock Company. The Erie Dock operates on a seven-day workweek. The revenues of the Erie Dock Company are generated in accordance with a cents per tonnage rate. Negotiations for the tonnage rate have traditionally transpired in the spring of the appropriate years. In 1975 the Erie Dock handled 1,392,000 tons of ore.

During the shipping season the Erie Dock receives between two to three ships per week for unloading. The Erie Dock cannot accommodate self-unloading ships, nor can it accommodate ships greatly in excess of 647 feet.

By letter of March 30, 1976 Conrail informed the Erie Dock Company that Conrail would not continue operations at the Erie Dock. As a result of this discontinuance ore traffic at the Erie Dock has ceased. Consequently, on June 4, 1976 the Erie Dock Company, confronted with ongoing costs and the absence of revenues, terminated its contract with Conrail regarding operation of the dock and related facilities, such termination to be effective as of August 3, 1976.

The C & P Dock and the dock facilities at Ashtabula, Ohio have absorbed part of the ore traffic formerly serviced by the Erie Dock. The remainder of such ore traffic has been diverted to other dock facilities.

In discontinuing service at the Erie Dock Conrail did not follow any of the procedures for discontinuance, termination, or abandonment set forth in the RRRA or the ICA. It is this failure which has given rise to the instant litigation; plaintiff William J. Brown proceeding pursuant to 49 U.S.C. § 1a, and the remaining plaintiffs proceeding pursuant to 45 U.S.C. § 744(g).

### III. *Statutes*

The statutes applicable to the instant case are set forth in pertinent part below. 49 U.S.C. § 1a(1):

No carrier by railroad subject to this part shall abandon all or any portion of any of its lines of railroad . . . and no such carrier shall discontinue the operation of all rail service over all or any portion of any such line . . . unless such abandonment or discontinuance is described in and covered by a certificate which is issued by the Commission and which declares that the present or future public convenience and necessity require or permit such abandonment or discontinuance . . . Abandonments and dis-

---

**3.** The parties conceded at trial that the contract between the Erie Dock Company and the Erie Lackawanna Railway Company was conveyed to Conrail. (Tr. 99).

**1256**

continuances shall be governed by the provisions of this section or of any other applicable Federal statute, notwithstanding any inconsistent or contrary provision in any State law or constitution, or any decision, order, or procedure of any State administrative or judicial body.

45 U.S.C. § 744(g):

After the rail system to be operated by the Corporation or a subsidiary thereof under the final system plan has been in operation for two years, the Commission may authorize the Corporation or a subsidiary thereof to abandon any rail properties as to which it determines that rail service over such properties is not required by the public convenience and necessity.

45 U.S.C. § 702(10):

"rail properties" means assets or rights owned, leased, or otherwise controlled by a railroad which are used or useful in rail transportation service. . . .

49 U.S.C. § 1(3):

"[R]ailroad" . . . shall include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad, and also all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease, and also all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property.

"[T]ransportation" . . . shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or ic-

ing, storage, and handling of property transported.

45 U.S.C. § 773:

The Corporation shall have the right to assign, allocate, reassign, reallocate, and consolidate work . . . pursuant to the terms of this chapter.

### IV. *Law & Discussion*

■ Pursuant to 49 U.S.C. § 1a(9) the State of Ohio has standing to prosecute this case. Conrail, however, has challenged the standing of the USW. The USW represents individuals who have suffered and are suffering economic loss as a result of the rerouting of rail traffic. These individuals are presently unemployed as a result of the actions of Conrail, by whom they are not employed and over whom they have no control. In such a situation the USW has standing to challenge the legality and propriety of the actions of Conrail. *United Transportation Union v. Burlington Northern, Inc.,* 319 F.Supp. 451 (D.Minn.1970).

Pursuant to 45 U.S.C. § 744(g) Conrail may not abandon any rail properties acquired pursuant to the FSP until two years after such acquisition, and then any such abandonment must be approved by the Interstate Commerce Commission (ICC). Similarly, 49 U.S.C. § 1a provides that no carrier by railroad shall abandon or discontinue all or any portion of any of its lines of railroad unless approved by a certificate from the ICC.

In order to ascertain whether Conrail violated the above provisions it must first be determined whether the Erie Dock facilities are "railroad properties" or a "line of railroad" within the context of the applicable statute, and, if determined to be so, whether Conrail has discontinued, terminated or abandoned such facilities.

■ By definition the term "railroad" includes "all switches, spur tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of . . . persons or property". 49 U.S.C. § 1(3). Transportation, as used in the above sense, includes "all instrumentalities and facilities of shipment or carriage". 49 U.S.C. § 1(3).

In the instant case the Erie Dock facilities constitute "instrumentalities and facilities of shipment or carriage" which are part and parcel of "terminal facilities . . . used or necessary in the transportation of . . . persons or property" within the context of the term "railroad". Such facilities are also "assets . . . used or useful in rail transportation service" and therefore constitute "rail properties" within the context of 45 U.S.C. § 702(10).

■ The parties have stipulated that 1,392,000 tons of ore were handled by the Erie Dock facilities in 1975. Such traffic was part of the actual transportation haul from shipper to consignee and therefore the Erie Dock facilities constitute a "line of railroad" which cannot be abandoned absent ICC approval. *I.C.C. v. Memphis Union Station Co.,* 360 F.2d 44 (6th Cir. 1966); *New Orleans Terminal Co. v. Spencer,* 366 F.2d 160 (5th Cir. 1966).

The Erie Dock facilities having been found to constitute rail properties and a line of railroad within the meaning of the applicable statutes, it remains to be determined whether such facilities have been abandoned.

■ Abandonment of a line of railroad implies an intention by a carrier to indefinitely or permanently cease all service. *I.C.C. v. Chicago, Rock Island & Pacific R.R. Co.,* 501 F.2d 908 (8th Cir. 1974); *I.C.C. v. St. Johnsbury & Lamoille County R.R.,* 403 F.Supp. 903 (D.Vt.1973). The determination of abandonment revolves around the intent of the railroad. Not every change in the ownership or mode of operation of a line of railroad constitutes abandonment. *City of Alexandria, Louisiana v. Chicago, Rock Island & Pacific R.R. Co.,* 311 F.2d 7 (5th Cir. 1962). Where cessation of service is the result of conditions over which the railroad has no control abandonment does not occur. *City of Alexandria, Louisiana v. Chicago, Rock Island & Pacific R.R. Co., supra.* The only question for the Court in such a case is whether there has been an abandonment within the intendment of the statute. The Court does not concern itself with the merits of the abandonment. *I.C.C.*

*v. Chicago, Rock Island & Pacific R.R. Co., supra.*

Conrail raises several contentions in support of its assertion that the Erie Dock facilities have not been abandoned.

■ Conrail initially contends that the use of the Erie Dock trackage for the storage and inspection of cars precludes a finding of abandonment. However, such use of the track serves only the internal purposes of Conrail and does not constitute a use substantially involved in the through movement of freight. *See, New Orleans Terminal Co. v. Spencer, supra.* Accordingly, such use does not preclude a finding of abandonment.

■ Conrail further contends that pursuant to 45 U.S.C. § 773 it can reallocate and consolidate work performed on the rail properties acquired as to eliminate waste. However, total reallocation is tantamount to abandonment and not mere relocation. *See, I.C.C. v. Memphis Union Station Co.,* 230 F.Supp. 456 (W.D.Tenn.1964). Further, such waste as would justify abandonment is critical to a determination of public convenience and necessity and therefore within the province of the ICC. *See, Long Island R.R. Co. v. N. Y. Central R. Co.,* 281 F.2d 379 (2d Cir. 1960). It is beyond Conrail's power to unilaterally determine to eliminate waste through the total reallocation of the services of a line of railroad.

■ Conrail further contends that the termination of the Erie Dock services was permissible as there was no demand for the facilities. Conrail relies on the case of *McGrody v. B. & O. R. R. Co.,* 217 F.Supp. 252 (E.D.Pa.1963) as authority for its contention. Conrail further relies on the fact that no complaints have been received from shippers since the closing of the Erie Dock, and the fact that service has been performed in accordance with the applicable tariffs.

The Court finds the *McGrody* case inapposite to the case at bar. In the *McGrody* case service was terminated as a result of the shipper's departure from the railroad's

facilities. In the case at bar there was no departure of shippers resulting in lack of demand. To the contrary, in 1975, 1,392,000 tons were handled by the Erie Dock. In the instant case the cessation of services at the Erie Dock was the direct result of Conrail's actions, not a lack of demand.

The fact that shippers have not registered complaints regarding the closing of the Erie Dock, and the fact that service is being performed according to the tariffs does not indicate a lack of demand for the Erie Dock services. Demand may be satisfied in such a fashion as to eliminate complaints and satisfy tariffs, and still be counterproductive to the public interest, convenience and necessity. Approval of abandonment is lodged with the ICC in order to avoid such counterproductivity.

■ The Court finds that the evidence presented clearly demonstrates that Conrail has abandoned the Erie Dock facilities in violation of 49 U.S.C. § 1a and 45 U.S.C. § 744(g).

### V. *Injunctive Relief*

■ Injunctive relief for the abandonment of rail services is discretionary with the Court. *I.C.C. v. Chicago & N. W. Transportation Co.*, 533 F.2d 1025 (8th Cir. 1976). An injunction will issue if equity so dictates. *I.C.C. v. Baltimore & Annapolis R.R. Co.*, 398 F.Supp. 454 (D.Minn.1975).

Upon due consideration the Court enjoins Conrail from abandoning service at the Erie Dock for the two-year period proscribed by 45 U.S.C. § 744(g). Such injunctive relief is consistent with the Congress' intent to provide a two-year period in order to properly evaluate and analyze the FSP. Further, the evidence at trial demonstrates that there is no difficulty incurred by Conrail in reopening the Erie Dock, (Tr. 51) and, as previously discussed, there is ample demand for the Erie Dock services.

■ Conrail asserts that even if injunctive relief may be proper that further hearings are necessary before relief should be ordered. Conrail relies on *I.C.C. v. Memphis Union Station Co.*, 230 F.Supp. 456 (W.D.Tenn.1964), as support for this contention. The Court finds *I.C.C. v. Memphis Union Station Co.* inapposite to the case at bar. In said case the Court found injunctive relief could not be granted until further hearings were held regarding the degree of inactivity necessary to constitute abandonment. In the case at bar there is no question as to the degree of inactivity involved. There has been a complete cessation of service.

■ Conrail contends that as the Erie Dock Company terminated its contract with Conrail, that Conrail is now free to negotiate with other subcontractors regarding the operation of the Erie Dock. However, the Erie Dock Company terminated its contract with Conrail as a direct result of Conrail's illegal abandonment of the Erie Dock facilities. Conrail may not profit by its own illegal actions as to obviate a viable binding contract. Accordingly, Conrail is ordered to honor the provisions of its contract with the Erie Dock Company upon reopening the Erie Dock facilities.

### VI. *Conclusion*

The Court finds that Conrail has abandoned the Erie Dock facilities in violation of the Interstate Commerce Act, 49 U.S.C. § 1 *et seq.*, and the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 *et seq.* It is therefore ordered that Conrail be and hereby is enjoined from abandoning such facility for the period proscribed by 45 U.S.C. § 744(g). It is further ordered that Conrail honor its contract with the Erie Dock Company upon reinstating service at the Erie Dock.

IT IS SO ORDERED.